**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| B & D LAND AND LIVESTOCK CO., an Iowa corporation, | |
| Plaintiff, | No. C 07-3070-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING JUDICIAL REVIEW OF FINAL AGENCY ACTION** |
| ED SCHAFER, Secretary, United States Department of Agriculture, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *A.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        *1.    The parties and their dispute* . . . . . . . . . . . . . . . . . . . . 3
        *2.    Prior litigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        *3.    The USDA's decision now at issue* . . . . . . . . . . . . . . . . . 5
        *4.    The present action* . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *B.  Facts Established By The Administrative Record* . . . . . . . . . . . . . . . . . 9
        *1.    The tract in question* . . . . . . . . . . . . . . . . . . . . . . . . 9
        *2.    The parties' renewed investigations* . . . . . . . . . . . . . . . 10
        *3.    The Hearing Officer's decision* . . . . . . . . . . . . . . . . . . 13

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    *A.  Federal Protection Of Wetlands* . . . . . . . . . . . . . . . . . . . . . . . . . 15
    *B.  Standards For Judicial Review* . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    *C.  Application Of The Judicial Review Standards* . . . . . . . . . . . . . . . . . 18
        *1.    Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . 18
            *a.    B & D's argument* . . . . . . . . . . . . . . . . . . . . . . 18
            *b.    The USDA's response* . . . . . . . . . . . . . . . . . . . . 19
            *c.    B & D's reply* . . . . . . . . . . . . . . . . . . . . . . . . . 21

2. *The definitions of a "wetland"* . . . . . . . . . . . . . . . . . . . . 23
    a. *The statutory definition* . . . . . . . . . . . . . . . . . . . . . 23
    b. *The regulatory definition* . . . . . . . . . . . . . . . . . . . . 27
3. *Review of the Hearing Officer's decision* . . . . . . . . . . . . . . 31
    a. *Conflation of statutory requirements* . . . . . . . . . . . . 31
    b. *Disregard of pertinent "saturation" evidence* . . . . . . . 33
    c. *Disregard of evidence that wetland hydrology had been*
       *removed* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
       i. *The drainage tile issue* . . . . . . . . . . . . . . . . . 34
       ii. *The adjacent disturbance issue* . . . . . . . . . . . . 36
    d. *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
D. *The Appropriate Relief* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

III. *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

T his is an action for judicial review of a final agency determination by the United States Department of Agriculture (USDA) that the plaintiff farmer has improperly "converted" certain "wetland" in violation of the "Swampbuster" Act, 16 U.S.C. §§ 3801, 3821-24. The farmer contends that the USDA's "wetland" determination is arbitrary and capricious, because the USDA improperly conflated the three statutory requirements for a "wetland" into two, eliminating the requirement of wetland hydrology by looking only at the presence of hydric soils and hydrophytic vegetation on the land in question, and ignoring all evidence that the wetland hydrology was eliminated in one area by a tile drainage system and disturbed in another area by an adjacent county road and drainage ditch. The USDA, however, asserts that it made a proper "expert" determination of the presence of "wetlands" on the tract in question and that the evidence to which the

farmer points is either irrelevant to the statutory definition of wetlands or is not credible. Thus, the USDA staunchly maintains that the certified wetlands determination that it originally made in 1999 is still correct, notwithstanding the farmer's equally staunch challenges to that determination through three separate actions for judicial review.

## I.  INTRODUCTION

### A.  Procedural Background

#### 1.    The parties and their dispute

The plaintiff in this action, B & D Land and Livestock Company,[1] is an Iowa corporation with its registered agent living in Franklin County, Iowa.  The defendant is Ed Schafer, the Secretary of the USDA.[2]  B & D alleges, and the Secretary does not dispute, that the Secretary of the USDA is ultimately responsible for the final agency actions of the USDA at issue in this case.

B & D owns real estate in Cerro Gordo County, Iowa, that is operated as a farm producing #2 yellow corn and soybeans.  The farm includes land identified as Section 32, Owen Township, Cerro Gordo County, Iowa, labeled by the USDA as Farm Number f2091, tract number t1653.  B & D purchased t1653 in 1997.  The USDA determined in 1999 that t1653 contains "wetlands," and subsequently determined that B & D had improperly "converted" 0.9 acres of those "wetlands" in 2000 to make possible the

---

[1]B & D alleges that it is identified in USDA records as B & D Land and Livestock, Inc.

[2]This action was originally brought against Chuck Conner, who was then the Acting Secretary of the United States Department of Agriculture.  However, Ed Schafer was sworn in as the Secretary of Agriculture on January 28, 2008.  Therefore, Ed Schafer was automatically substituted as the proper party defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

production of agricultural commodities on that land in violation of the "Swampbuster" Act, 16 U.S.C. §§ 3801, 3821-24. The consequences of such a determination include B & D's ineligibility for USDA farm program benefits. B & D disputes the USDA's "wetlands" determination and, hence, disputes the USDA's "conversion" determination as to some of those "wetlands."

## 2.    *Prior litigation*

This action is the third one arising from the USDA's determination that B & D "converted" certain "wetland" on t1653 in 2000. B & D filed its first action for judicial review on July 10, 2002, disputing the USDA's determination that B & D had "converted" 0.9 acres of "wetland" on t1653. *See B & D Land and Livestock Co. v. Veneman*, No. C 02-3051-MWB (N.D. Iowa). In that action, by order dated November 15, 2002, the court "preliminarily enjoin[ed] [the Secretary of the USDA] from pursuing, instituting, continuing, or completing any and all enforcement actions, including, but not limited to, certification of the ineligibility of the plaintiff or any of its shareholders for farm program benefits pursuant to the Food Security Act, 16 U.S.C. §§ 3821-3824, as amended, until such time as th[e] preliminary injunction is dissolved or vacated, by this court or a reviewing court." *B & D Land and Livestock Co. v. Veneman*, 231 F. Supp. 2d 895, 914 (N.D. Iowa 2002) (*B & D I*). Following the court's entry of the preliminary injunction, the court remanded B & D's first judicial review action, at the USDA's request, for further review upon a complete record. *B & D Land and Livestock Co. v. Veneman*, No. C 02-3051-MWB, slip op. (N.D. Iowa Jan. 18, 2003).

After remand, however, the USDA determined that it would stand upon its prior determination that B & D had "converted" certain "wetland" in 2000 and its further determination that B & D was not entitled to equitable relief from the consequences of such a "conversion." Therefore, B & D brought a second action for judicial review on

September 30, 2003, *B & D Land and Livestock Co. v. Veneman*, No. C 03-3086-MWB (N.D. Iowa). B & D did not seek a preliminary injunction on enforcement action by the USDA during the pendency of its second action for judicial review, however, because the USDA took no enforcement action during the pendency of that action. On August 17, 2004, the court rendered its decision in B & D's second action for judicial review. *B & D Land and Livestock Co. v. Veneman*, 332 F. Supp. 2d 1200 (N.D. Iowa 2004) (*B & D II*). In its order, the court found and declared "that the 1999 wetland determination was subject to 'appeal' in the administrative proceedings concerning B & D's purported wetland 'conversion' violation, and the agency's final determination to the contrary was arbitrary and capricious, an abuse of discretion, and contrary to law." *B & D II*, 332 F. Supp. 2d at 1216. The court held, further, that "the Director Review Determination as to Tract # 1653 is vacated in its entirety and this case is remanded for agency action in conformity with the court's judgment." *Id.*

### 3.     *The USDA's decision now at issue*

The parties engaged in further administrative proceedings pursuant to the court's second remand order. The results of those proceedings left B & D no happier than the prior agency determinations had, however. By letter dated January 22, 2007, Richard Van Klaveren, State Conservationist for the National Resources Conservation Service (NRCS), a department of the USDA, notified B & D that the NRCS had fully re-examined the sites in question and the records and had determined that the certified wetland determinations conducted in 1999 were correct and, furthermore, that B & D's removal of woody vegetation in 2000 was a "conversion" of 0.9 acres of "wetland." The NRCS decision was based on a November 9, 2006, highly erodible land and wetland conservation determination completed by Tony Moore, designated conservationist. The NRCS letter

stated, further, that the NRCS had found no applicable exemptions for conversion of the wetland in question.

B & D appealed the November 9, 2006, wetland determination to the National Appeals Division (NAD) of the USDA. The NAD Hearing Officer, Michael R. Stewart (the Hearing Officer), held an evidentiary appeal hearing on B & D's appeal on June 27, 2007, in Mason City, Iowa. Following that hearing, in a decision dated August 30, 2007, the Hearing Officer upheld the agency's November 9, 2006, wetland conservation determination. Neither party sought a director's review of the Hearing Officer's decision. Therefore, the Hearing Officer's decision constitutes final administrative action by the Secretary of the USDA.

### 4.  *The present action*

B & D now seeks judicial review of the Hearing Officer's August 30, 2007, final determination. In a Complaint filed October 4, 2007, B & D seeks declaratory judgment, as follows:

> 31.  The Final Agency action was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; was in excess of statutory jurisdiction, authority, or limitations or short of statutory rights; was without observance of procedure required by law, and was unsupported by substantial evidence for reasons that include the following:
>> A.  The evidence of inundation and saturation gathered by NRCS was not gathered following the wetland delineation methodology to be used by NRCS and is thus not reliable.
>> B.  There is persuasive evidence that an agricultural commodity was produced at least once prior to December 23, 1985 on the delineated wetland and converted wetland making it prior converted cropland.

6

C.  The Plaintiff presented credible persuasive evidence of a drainage tile installed prior to December 23, 1985 which would remove the wetland hydrology for Site #3, making it a converted wetland converted before December 23, 1985.

D.  The Plaintiff produced credible persuasive evidence that the road ditch removes the wetland hydrology from Site #1, making it a converted wetland converted before December 23, 1985.

E.  Production of an agricultural commodity at least once prior to December 23, 1985 is not necessary to remain eligible for USDA program benefits when an agricultural commodity is produced on a converted wetland if the conversion of the wetland occurred prior to December 23, 1985.

Complaint (docket no. 2), ¶ 31. B & D also demands judgment as follows:

A.  That this Court declare that the Agency's action was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; was in excess of statutory jurisdiction, authority or limitations or short of statutory right; was without observance of procedure required by law, and was unsupported by substantial evidence, all in violation of 5 U.S.C. § 706.

B.  That this Court remand the matter to the Defendant with specific instructions that the Defendant determine:

1.  that Plaintiff's removal of woody vegetation from t1653 does not make it ineligible for farm program benefits and,

2.  that any wetlands on t1653 are converted wetlands converted prior to December 23, 1985.

C.	That this Court find the position of the United
	States was not substantially justified and grant
	Plaintiff reasonable attorney fees pursuant to the
	provisions of 28 U.S.C. § 2412.

D.	That this Court grant Plaintiff costs of suit
	herein.

E.	That the Court grant such further and other relief
	as this Court deems appropriate.

Complaint, Demand for Judgment. The USDA filed an Answer (docket no. 7) on November 21, 2007, in which the USDA denies that B & D is entitled to any of the relief for which B & D prays and, further, requests that the court dismiss B & D's action, with costs to B & D. Answer (docket no. 7) (Prayer).

On November 30, 2007, B & D filed a Motion For Preliminary Injunction (docket no. 8) in this action asking the court to enjoin the Secretary of the USDA, during the pendency of this action for judicial review, from pursuing, instituting, continuing, or completing any and all enforcement action against B & D or Larry Doane on account of the USDA's final agency action and from denying the payment of or attempting to collect previously paid benefits to B & D or Larry Doane on account of USDA's final agency action. Plaintiff's Motion For Preliminary Injunction, Prayer. By order dated January 22, 2008, the court granted B & D's Motion For Preliminary Injunction. *B & D Land and Livestock Co. v. Conner*, 534 F. Supp. 2d 891 (N.D. Iowa 2008) (*B & D III*).

Next, the parties filed their briefs on the merits of this action for judicial review. More specifically, B & D filed it Brief (docket no. 20) on April 1, 2008. The USDA filed its Brief (docket no. 23) on May 27, 2008. Finally, B & D filed a Reply Brief (docket no. 26) on June 17, 2008.

This action for judicial review is now fully submitted.

## B. Facts Established By The Administrative Record

The court finds that the following facts are established upon review of the complete administrative record submitted by the parties.

### 1. The tract in question

B & D purchased t1653 in 1997. Larry Doane, an affiliated person of B & D, testified at the administrative evidentiary hearing that the tenant on the tract from 1972 to 1986, Marvin Gaubatz, had told him that he farmed the tract and that there were no trees on the tract other than some trees in the fence row. Therefore, Doane testified that Gaubatz told him that he was able to grow row crops on the entire tract. Doane also presented at the administrative evidentiary hearing an aerial photograph from 1985 showing no trees on the portion of t1653 subsequently designated "converted wetland." Administrative Record at 1334, 1453. From 1987 to 1997, t1653 was enrolled in the Conservation Reserve Program (CRP) and, consequently, no crops were grown on the tract during that time. In 1999, however, after B & D had purchased the tract, the NRCS made a wetland determination concerning t1653 in which the NRCS determined that there were 1.8 acres of wetland in field #1, 0.27 acres of wetland in unnumbered field 1, and 1.7 acres of wetland in unnumbered field 2. B & D initially filed an administrative appeal concerning this "wetlands" determination, but later withdrew that appeal. Doane has since explained that he withdrew B & D's administrative appeal, because he did not understand the process.

Notwithstanding the "wetlands" determination in 1999, B & D admits that, in the spring of 2000, it removed woody vegetation from t1653, because that vegetation was a nuisance to farming. That action led the NRCS to determine that B & D had "converted" 0.9 acres of "wetland" in unnumbered field 1 (subsequently redesignated site 3). The results of the pertinent series of administrative proceedings and actions for judicial review

concerning that determination were discussed above. The USDA's latest reiteration of its "wetlands" and "conversion" determination, after further administrative investigation following the second remand by this court, is now at issue.

### 2. *The parties' renewed investigations*

Following that second remand, the USDA conducted a review of the 1999 wetland determination. As part of that review, on April 29, 2005, NRCS personnel, including investigator Jim Gertsma, went to what is now described as site 3 on t1653, which is 3.7 acres in the northeast corner of t1653, to review the prior determination that site 3 contains hydric soils. Gertsma's data forms, Administrative Record at 1088-1105, indicate that, in nine test sites, he found hydric soils, but no surface water, no free water in a test pit, and, where noted, a depth to saturated soil of 35 inches or more.

Subsequently, the USDA attempted to verify B & D's claim that there was drainage tile in site 3, which B & D contended would remove wetland hydrology. On April 21, 2006, the USDA hired a private contractor, Mr. Ries, to verify the presence or absence of drainage tile on the site. Tony Moore, the NRCS district conservationist, and David Rohlf, a drainage engineer employed by the NRCS, were present at the time of the contractor's investigation, along with Larry Doane. Administrative Record at 222-23 (Administrative Hearing Transcript at 141-42). The contractor did locate drainage tile on the tract by digging a hole with his backhoe. Administrative Record at 224. That tile was located approximately where the contractor had previously found tile while doing tiling for the owner of the land to the north of site 3. Administrative Record at 218-25. There is no evidence that the tiling was installed by B & D or, indeed, that it was installed after 1985. As soon as the tile was broken during the NRCS investigation in April 2006, water came "boiling out" and filled the hole, but did not overflow it. Administrative Record at 144. Mr. Rohlf, the NRCS drainage engineer present, commented at the time that the

presence of the tile indicated that the tract was "prior converted wetland," meaning converted prior to December 23, 1985. Administrative Record at 225-27.

On November 9, 2006, Mr. Moore completed a Highly Erodible Land and Wetland Conservation Determination (the 2006 Wetland Determination). Administrative Record at 987-89. In his 2006 Wetland Determination, Mr. Moore concluded that 0.9 acres of site 3 were still properly designated "converted wetland," based on the April 14, 2000, determination and certification. The 2006 Wetland Determination does not provide any explanation of the basis for the determination, although it does indicate the presence of hydric soils on the tract. Mr. Moore testified at the administrative hearing on B & D's appeal of his determination that he believed that the tile drainage system probably had not been functioning as of December 23, 1985, and was not functioning at the time it was rediscovered, because the water would not have "boiled out" of the tile if it had been functioning, and other wetland indications, such as woody vegetation, would not have been present. Administrative Record at 226-27. Mr. Moore did not investigate prior to the administrative hearing whether the tile drainage system was actually plugged, however. B & D disputes that there were any indications of wetlands on the pertinent portion of the tract in 1985, because, for example, B & D had presented evidence that there were no trees on the pertinent portion of the tract in an aerial photograph from 1985, and B & D had also presented evidence that crops were grown on the entire tract through the 1985 season.

By letter dated January 22, 2007, Richard Van Klaveren, the State Conservationist for the NRCS, advised B & D of the NRCS's final technical determination concerning the presence of wetlands on t1653. Administrative Record at 19-21. The letter stated, in pertinent part, "NRCS has fully re-examined the site and the records and determined that the certified wetland determination conducted in 1999 was correct as defined in 7 C.F.R.

Part 12." Administrative Record at 20. The letter stated, further, that, in 2000, B & D had cleared woody vegetation from the area designated wetland, and that, as a result of removal of woody vegetation, production of crops was made possible. Ultimately, the letter concluded as follows:

> NRCS has determined that the area in question was a wetland. Further, NRCS has determined that you removed woody vegetation and this action made production of a commodity crop possible. The land was converted as defined in 7 C.F.R. § 12.2 "converted wetland" and § 12.4(a)(3).

> Finally, NRCS has reviewed all potential exemptions provided in 7 C.F.R. § 12.5(b) and has determined that no exemptions apply. The appropriate USDA wetland label is CW-2000 (Converted Wetland in year 2000) and is designated as such on the attached "certified" Highly Erodible Land and Wetland Determination NRCS-CPA-026E and map.

Administrative Record at 20. B & D appealed the NRCS decision and the 2006 Wetland Determination to the NAD.

In preparation for its appeal to the NAD, B & D hired an independent drainage engineer, Don Etler, of Kuehl & Prayer, Ltd., to review the wetland determinations on t1653 and to review the land surface and the drainage features that are on the land to determine if the wetland determinations were correct, and if not, how they were incorrect. Administrative Record at 104-07. Mr. Etler and other employees of Kuehl & Prayer, Ltd., visited the farm on May 2, 2007, and Mr. Etler subsequently prepared a written report. Administrative Record at 1350-77 (report). Mr. Etler's opinions in his report differ dramatically from the NRCS's. For example, Mr. Etler states that, in his opinion, "NRCS has failed to properly delineate jurisdictional wetlands on the land [in question] owned by B & D Land and Livestock Company . . . because [the agency] has used routine

procedures to delineate wetlands which do not take into account the significant hydrologic disturbances that have been proven to exist in both the northeast and southeast areas of the farm." Administrative Record at 1360. His report indicates that the "disturbances" include the tile drainage system and a road bordering the tract. More specifically still, it is Mr. Etler's opinion "that the entire set of certified wetland determinations done by the NRCS dated January 20, 1999; June 13, 2000; and January 22, 2007 should be set aside as invalid." Administrative Record at 1360. Mr. Etler provided testimony consistent with his report at the administrative hearing. He also testified that Mr. Moore had erroneously concluded that the tile drainage system was not functioning because water had boiled out of the broken tile during Mr. Moore's investigation of the presence of the tile. Mr. Etler explained that, in his opinion, if the tile was plugged, then the hole would have filled full of water and saturated the ground, and would have continued to be fed by water from further up the line, but the ground was not saturated, and the hole did not overflow. Administrative Record at 375-79.

### 3. The Hearing Officer's decision

Hearing Officer Michael R. Stewart held an evidentiary hearing on B & D's administrative appeal on June 27, 2007. On August 30, 2007, the Hearing Officer issued an opinion concluding, in pertinent part, that B & D had not met its burden of proving by the preponderance of the evidence that the USDA's adverse determinations are erroneous. Therefore, he concluded that the NRCS's decision is not clearly erroneous. Administrative Record at 446-58. Somewhat more specifically, the Hearing Officer acknowledged that there was a tile drainage system affecting the area designated "converted wetland," but found no persuasive evidence that production of an agricultural commodity occurred on that land before December 23, 1985. Administrative Record at 457. He also found that the tile drainage system had not completely removed the wetland hydrology from site 3 and

that an underlying sand layer and the county road and ditch adjoining site 1 had not removed the wetland hydrology from that area, either, because of the predominance of hydrophytic vegetation in both sites:

> I carefully and thoroughly considered Appellant's arguments but conclude they do not show NRCS failed to follow its regulations. I previously outlined the regulations defining a wetland and the methodology NRCS must follow to identify wetlands. On site 3 (2006), Appellant contends a drain tile removes the hydrology necessary for a wetland to exist (FOF 28). In 1998, site 3 (1999) had soil saturation in the upper 12 inches and 75-percent of dominant plant species were hydrophytes (FOF 2 and 6). If a drain tile completely removes the wetland hydrology, I find it unlikely the area would exhibit a predominance of hydrophytic vegetation or soil saturation. Appellant's arguments do not explain the existence of these conditions if the wetland hydrology is absent.

> On site 1, Appellant contends the underlying sand layer acts as a drain tile eliminating water to the adjoining ditch (FOF 28). As is the case for site 3 (1999), site 1 exhibited soil saturation in the upper 12 inches and 100-percent of the dominant plant species were hydrophytes (FOF 2 and 6). As previously stated, Appellant's arguments lack an explanation of the existence of these conditions absent wetland hydrology.

> I agree that the drain tile in site 3 (2006) and the underlying sand layer in site 1 have some affect [sic] on wetland hydrology. However, Appellant's arguments do not convince me that these factors eliminate the wetland hydrology to the extent that they remove wetland characteristics.

Administrative Record at 457. The Hearing Officer also concluded that he did not have the authority to make a determination on equitable relief. Administrative Record at 457-58.

## II.  LEGAL ANALYSIS

### A.  Federal Protection Of Wetlands

In previous incarnations of this case and in other "Swampbuster" cases, this court has considered the legal background and regulatory regime for wetlands protection under the "Swampbuster" Act, 16 U.S.C. §§ 3801, 3821-24.  *See B & D II*, 332 F. Supp. 2d at 1208; *Branstad v. Veneman*, 212 F. Supp. 2d 976 (N.D. Iowa 2002) (*Branstad III*); *Branstad v. Veneman*, 145 F. Supp. 2d 1011, 1014 (N.D. Iowa 2001) (*Branstad II*); *Branstad v. Glickman*, 118 F. Supp. 2d 925, 927-28 (N.D. Iowa 2000) (*Branstad I*). Therefore, the court will not reiterate that legal background here.  Suffice it to say that the purpose of the "Swampbuster" Act is to "'combat the disappearance of wetlands through their conversion into crop lands.'"  *Branstand III*, 212 F. Supp. 2d at 986 (quoting *Barthel v. USDA*, 181 F.3d 934, 936 (8th Cir. 1999), in turn quoting *Gunn v. USDA*, 118 F.3d 1233, 1235 (8th Cir. 1997), *cert. denied*, 522 U.S. 1111 (1998)).  Thus, "the goal of the Swampbuster Act [w]as preservation of wetlands, and the 'stick' for enforcement of its provision [w]as loss of federal farm program benefits if wetlands are improperly converted."  *See Branstad I*, 118 F. Supp. 2d at 940 (citing *Barthel*, 181 F.3d at 936; *Gunn*, 118 F.3d at 1235); *see also id.* at 927-28 (discussing generally the regulatory regime under the Swampbuster Act).  In the present case, the consequence of the USDA's determination that B & D has "converted" "wetland" would be the loss of farm program benefits for crop year 2000 and thereafter.

### B.  Standards For Judicial Review

In *Branstad III*, this court also stated the standards applicable in a judicial review of the USDA's determination that a producer has "converted" wetland, as follows:

The Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, is the correct vehicle for judicial review of USDA administrative action under the Swampbuster Act. *See Barthel*, 181 F.3d at 937 (applying APA judicial review to USDA determinations under the Swampbuster Act); *Downer [v. United States by USDA]*, 97 F.3d [888m] 1002 [(8th Cir. 1996)] (same); *Von Eye [v. United States]*, 92 F.3d [681,] 685 [(8th Cir. 1996)] (same). However, judicial review under the APA is only available for a "final" agency determination. *See* 5 U.S.C. § 704 (permitting review of "final" agency action); *In re Russell*, 155 F.3d 1012, 1013 (8th Cir. 1998) ("the APA waives immunity only when the agency action is final") (citing 5 U.S.C. § 704). . . .

\* \* \*

Under the APA, a final agency determination may be overturned on judicial review only if it is arbitrary and capricious, an abuse of discretion, or otherwise contrary to law. *See* 5 U.S.C. § 706; *see also Barthel*, 181 F.3d at 937; *Downer v. United States*, 97 F.3d 999, 1002 (8th Cir. 1996) (in an action for judicial review of administrative determinations concerning wetlands under the Swampbuster Act, the court concluded that "[o]ur review . . . is limited to a determination of whether the decisions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'") (quoting 5 U.S.C. § 706(2)(A)). As this court explained in *Branstad I*,

> "This narrow review entails a 'searching and careful' de novo review of the administrative record presented to determine 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" [*Downer*, 97 F.3d at 1002] (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989)).

> More specifically,

>> To perform this review the court looks to whether the agency considered those factors

Congress intended it to consider; whether the agency considered factors Congress did not intend it to consider; whether the agency failed entirely to consider an important aspect of the problem; whether the agency decision runs counter to the evidence before it; or whether there is such a lack of a rational connection between the facts found and the decision made that the disputed decision cannot "be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed. 2d 443 (1983). If the agency itself has not provided a reasoned basis for its action, the court may not supply one. *Id.*

Nonetheless, the reviewing court may not substitute its judgment for that of the agency and must give substantial deference to agency determinations. *Id.* This deference is particularly appropriate when the agency determination in issue concerns a subject within the agency's own area of expertise. *Marsh*, 490 U.S. at 377-78, 109 S. Ct. at 1861-62. An agency making fact-based determinations in its own field of expertise, particularly where those determinations are wrapped up with scientific judgments, must be permitted "to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 378, 109 S. Ct. at 1861.

*Downer*, 97 F.3d at 1002.

*Branstad I*, 118 F. Supp. 2d at 939-40.

*Branstad III*, 212 F. Supp. 2d at 988-89. The court reiterated this formulation of the standard of review in a prior incarnation of this case, as well. *See B & D II*, 332 F. Supp.

2d at 1208-09. The formulations of the applicable standard of review by the parties in this action do not differ in any legally significant respect from this court's statement of the standard above.

## C. Application Of The Judicial Review Standards

It is clear from the parties' briefs that the critical question in this case is whether the USDA properly determined that any of the portions of t1653 in question are "wetlands" within the meaning of the Swampbuster Act. The court will now summarize the parties' arguments on that question.

### 1. Arguments of the parties

#### a. B & D's argument

B & D argues, in essence, that the USDA has improperly focused on the presence of hydric soils and hydrophytic vegetation on the sites in question, completely disregarding the third statutory requirement for a "wetland," wetland hydrology. B & D points out that Mr. Gertsma's nine soil probes in 2005 found that any saturation was below thirty-five inches, but the USDA nevertheless erroneously relies on a single soil probe by Tony Moore in 1998 that found saturation in the upper twelve inches of the soil. B & D points out that Mr. Gertsma and Mr. Moore used the same soil probe method and performed their tests at the same time of year, April, but their results are substantially different, and the USDA's final determination makes no attempt to reconcile those differences. B & D also argues that Mr. Etler's investigation of the wetland area and his opinion about the effect of the drainage tile discovered in recent investigations—that all wetland hydrology has been removed—are consistent with Mr. Gertsma's nine soil probes, and contrary to Mr. Moore's single probe in 1998. B & D argues that, notwithstanding the consistency of evidence contrary to Mr. Moore's determination, the USDA clings to Mr. Moore's

determination, with no attempt to acknowledge or evaluate the credibility of any contrary evidence. B & D points out that the USDA had the opportunity to challenge David Rohlf's, Jim Gertsma's, and Don Etler's evidence, but did not do so and, consequently, did not take a hard look at the problem and did not consider all the relevant factors when making a decision. B & D argues that the USDA and Mr. Moore are simply unwilling to change or reevaluate a potentially erroneous decision in spite of all evidence to the contrary. B & D argues that the record demonstrates that Mr. Moore's and the USDA's determinations are wrong or, to be more precise, are arbitrary, capricious, abusive, and not supported by the evidence, as a result of failing to take a look at all of the relevant factors.

As to Site 1, where the USDA has found "wetlands," but thus far has not alleged or found that B & D has "converted" any such "wetlands," B & D argues that Tony Moore's 1999 determination was based on observation of water on the surface, but that Moore also noted that the adjacent road ditch was full of cattails, which B & D argues means that water from Site 1 was draining into the ditch. B & D argues that the USDA has never properly considered the effect of the drainage into the road ditch. On the other hand, B & D argues that Mr. Etler's excavation of observation wells and observation of the wetness of the area contradicts Mr. Moore's determination. B & D argues that Mr. Etler also properly considered the effect of the "disturbance" of any wetland hydrology on Site 1 as a result of the adjacent ditch, but that the USDA never applied the appropriate standards for evaluation of a "disturbed" area. Thus, B & D argues that the "wetland" determination for Site 1 must also be set aside.

### b.    *The USDA's response*

The USDA contends that the sites in question were and are "wetlands" within the statutory and regulatory definition in 16 U.S.C. § 3801 and 7 C.F.R. § 12.2. More

specifically, the USDA argues that the reports of soil scientists demonstrated the first statutory requirement, the presence of hydric soils; that the reports of plant biologists demonstrated the prevalence of hydrophytic vegetation on the parcels in question, the third statutory requirement; and that the prevalence of hydrophytic vegetation demonstrated that the second requirement, wetland hydrology, was also met.

The USDA contends that B & D has not presented any credible evidence to contradict the USDA's findings. The USDA dismisses Mr. Etler's testimony as "not significant," because even if a drainage tile had been present at one time, and even if water was or was not present, these are not statutory criteria for determining whether or not a parcel is a "wetland." The USDA argues that even if the drainage tile, to which Mr. Etler points, was fully functional, that fact would not support B & D's position that the parcel was not a wetland, because Mr. Etler did not consider that the plants and soils present were clearly of such a nature as to support the conclusion that the parcel was a wetland. The USDA also points out that Mr. Rohlf did not testify at the evidentiary hearing, and he was not the proper person to make a wetlands determination in any event, so that any comments he made at the time of the rediscovery of the drainage tile about whether the parcel was or was not a wetland were hearsay that the Hearing Officer could properly disregard.

More specifically, as to Site 3, on the north of the tract, the area in which the USDA has found both a "wetland" and a "conversion" of part of that "wetland," the USDA argues that the parcel exhibited the three statutory criteria of a "wetland." The USDA repeats that the presence of a drainage tile is not a statutory criterion, and argues that there is no evidence that the tile was functional, and, indeed, expressly contends that the drainage tile was not functional, because water bubbled out of it, and there is no evidence that Doane performed any maintenance on the tile when he removed trees on the

parcel.  The USDA concedes that the drainage tile was most likely present prior to 1985, but contends that it is nevertheless clear that the drainage tile had little effect on the hydrology of the area, because hydric soils and a prevalence of hydrophytic vegetation were present.

As to Site 1, on the southeast portion of the tract, adjacent to a county road, the USDA argues that it has consistently found that all three statutory criteria were met.  The USDA argues that Mr. Etler's contentions that the area has been "disturbed" by the road are irrelevant, because the USDA has never claimed that the parcel was disturbed, manipulated, or even "converted" by Doane.  The only "disturbance," according to the USDA, was by the county on adjacent land.  Thus, the USDA argues that, even if the county undertook maintenance of its ditch and significantly lowered the level of the ditch, which the USDA concedes is very likely given the elevation of the ditch and the surrounding lands, such action was an independent action by the county on its adjacent land, so that it has no legal effect on the status of B&D's land as a "wetland."

In short, the USDA argues that the "wetland" determinations in question were correct, that there is no dispute that B & D "converted" a part of one of those "wetlands," or that the USDA properly determined that the "conversion" had more than "minimal effect."

### c.     B & D's reply

In its reply, B & D contends that the USDA's response, like the final determination at issue here, asks the court to rule that the wetland hydrology requirement in the statutory definition of a "wetland" simply is not necessary.  B & D points out that the USDA acknowledges that there are three statutory criteria, including inundation or saturation sufficient to support hydrophytic vegetation, *i.e.*, wetland hydrology, but then asks the court to affirm the USDA's wetland determination, because the USDA proved that two of

the criteria, hydric soil and hydrophytic vegetation, were present, without regard to the presence of wetland hydrology. B & D argues that the USDA has relied on only the presence of hydric soils and hydrophytic vegetation as to both Site 1 and Site 3, and has ignored the effect of the ditch on the hydrology of Site 1 and the effect of the drainage tile on the hydrology of Site 3. B & D argues, however, that the presence of drainage tile on Site 3 and the county road adjacent to Site 1 plainly affect the requirement of inundation or saturation required for wetland hydrology. B & D argues that ignoring the wetland hydrology requirement is contrary to the USDA's own procedures for wetland identification in the National Food Security Act Manual (NFSAM).

B & D also rejects the USDA's argument that the drainage tile was not functioning, by pointing to evidence from Mr. Etler and Mr. Rohlf that the water flowing out of the tile, when it was broken, did not mean that the tile was plugged. Thus, B & D argues that it is only Mr. Moore's unsupported theory, contrary to expert testimony, that the tile was plugged. B & D also argues that the USDA improperly ignored B & D's evidence, again from Mr. Etler, that the road ditch is facilitating drainage from Site 3 by preventing the necessary inundation and saturation of that parcel.

B & D also takes issue with the USDA's present assertion that Mr. Etler's testimony is not relevant, arguing that the Hearing Officer actually did consider Mr. Etler's testimony relevant, but improperly found it was not credible. B & D argues that it is not reasonable to conclude that evidence gathered by Tony Moore and Robin Wisner during one visit in 1998, which did not take into account either the drainage tile or the adjacent county road, and involved only a single soil probe, is more credible than the evidence of an expert engineer based on extensive investigation of all of the relevant circumstances.

## 2. The definitions of a "wetland"

### a. The statutory definition

From the parties' arguments, it is apparent that this case turns on whether or not the USDA properly applied the statutory and regulatory definitions of a "wetland" to the parcels in question on B & D's land. At all pertinent times, the Swampbuster Act defined a "wetland" as follows:

> The term "wetland", except when such term is part of the term "converted wetland", means land that—
>
> (A) has a predominance of hydric soils;
>
> (B) is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions; and
>
> (C) under normal circumstances does support a prevalence of such vegetation.
>
> For purposes of this Act, and any other Act, this term shall not include lands in Alaska identified as having high potential for agricultural development which have a predominance of permafrost soils.

16 U.S.C. § 3801(a)(27) (2008) (formerly (a)(18), formerly (a)(16)); *Ballanger v. Johanns*, 495 F.3d 866, 867 (8th Cir. 2007) (citing then-§ 3801(a)(18)); *Downer v. USDA*, 97 F.3d 999, 1003 (8th Cir. 1996) (citing then-§ 3801(a)(16)). The three statutory requirements, identified in subsections (A), (B), and (C), can be described as the "hydric soils," "wetland hydrology," and "hydrophytic vegetation" requirements, respectively. *See, e.g., Groenendyk v. Johanns*, 2008 WL 428157, *10 (S.D. Iowa Feb. 12, 2008) (slip op.); *see also* NFSAM, Pt. 527.4, Administrative Record at 694. The parties in this case

23

do not dispute the presence of two of these three criteria, "hydric soils" and "hydrophytic vegetation," on the parcels in question. Rather, their dispute centers on the presence or absence of "wetland hydrology," and more specifically, whether the "wetland hydrology" and "hydrophytic vegetation" requirements can be conflated, such that evidence of the prevalence of "hydrophytic vegetation" suffices to prove "wetland hydrology." The court finds that the statute plainly and unambiguously defines these three requirements as *separate, mandatory* requirements, which the USDA has improperly conflated in this case.

This court has, on numerous occasions, pointed out that the first approach to statutory interpretation is the "plain language" of the statute in question. *See, e.g., B & D II,* 332 F. Supp. 2d at 1210; *Kinkaid v. John Morrell & Co.,* 321 F. Supp. 2d 1090, 1103 n. 3 (N.D. Iowa 2004) (citing such reiterations); *accord United States v. Cacioppo,* 460 F.3d 1012, 1016 (8th Cir. 2006). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S. Ct. 1146, 117 L. Ed. 2d391 (1992). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *Ron Pair Enters., Inc.,* 489 U.S. at 241-42, 109 S. Ct. 1026; *United States v. Goldenberg,* 168 U.S. 95, 102-03, 18 S. Ct. 3, 42 L.Ed. 394 (1897); *Oneale v. Thornton,* 10 U.S. (6 Cranch) 53, 68, 3 L.Ed. 150 (1810)). When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair,* 489 U.S. at 241, 109 S. Ct. 1026 (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S. Ct. 192, 61 L.Ed. 442 (1917)); *Cacioppo,* 460 F.3d at 1016 ("Where the language is plain, we need inquire no further.") (citing *Ron Pair,* 489 U.S. at 241, 109 S. Ct. 1026). Here, applying this "cardinal canon" to the statutory definition of a "wetland," it is apparent that the three statutory requirements are unambiguously stated in the conjunctive, so that the parcel in

question must satisfy all three in order to be a "wetland." *Cf. United States v. Roque-Espinoza*, 338 F.3d 724, 728 (7th Cir. 2003) (noting that several sister circuits had held that, because 8 U.S.C. § 1326(d) stated three requirements in the conjunctive, all three were mandatory, and a defendant had to satisfy all three in order to prevail on a collateral attack, and joining those circuits); *United States v. Evangelista*, 122 F.3d 112, 121 (2d Cir. 1997) (the phrase "truthfully account for and pay over," in 26 U.S.C. § 7202, was "unambiguously conjunctive," so that somebody who was required to "truthfully account for and pay over" a tax would be required to do both things to satisfy the requirement, and any intentional failure to complete the required task, consisting of both requirements, constituted a crime).

Section 3801(a)(27)(B) also unambiguously defines two alternative conditions sufficient to satisfy the second of the three statutory requirements, by using the disjunctive "inundation *or* saturation." 16 U.S.C. § 3801(a)(27)(B) (emphasis added); *see, e.g., United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994) ("The ordinary usage of the word 'or' is disjunctive, indicating an alternative."). The statute then unambiguously defines the "inundation *or* saturation" as accomplished "by surface *or* groundwater," with the further condition that the "inundation *or* saturation" must be "at a frequency *and* duration sufficient to support a prevalence of hydrophytic vegetation *typically* adapted for life in saturated soil conditions." 16 U.S.C. § 3801(a)(27)(B) (emphasis added). Thus, one question in defining a "wetland" under the statute is whether the "wetland hydrology" is "sufficient to support a prevalence of hydrophytic vegetation *typically* adapted for life in saturated soil conditions." The statute does not, however, define "wetland hydrology" in terms of the presence or prevalence of "hydrophytic vegetation," but in terms of "inundation *or* saturation" sufficient to make the prevalence of hydrophytic vegetation possible. In addition, § 3801(a)(27)(B) states that "hydrophytic vegetation" is vegetation

that is "typically," not "exclusively," adapted for life in saturated soil conditions, so that the presence of "hydrophytic vegetation" does not necessarily demonstrate the existence of the necessary wetland hydrology. Finally, the statute identifies the actual prevalence of "hydrophytic vegetation" as a *third, separate* requirement for a "wetland," in addition to "hydric soils" and sufficient "saturation *or* inundation," *i.e.*, wetland hydrology. 16 U.S.C. § 3801(a)(27).

At all pertinent times, the Swampbuster Act further defined the first and third statutory requirements for a wetland in § 3801(a)(27)(A) and (B), "hydric soil" and "hydrophytic vegetation," in separate provisions, as follows:

> The term "hydric soil" means soil that, in its undrained condition, is saturated, flooded, or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation.

> The term "hydrophytic vegetation" means a plant growing in—

> (A) water; or

> (B) a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content.

16 U.S.C. § 3801(a)(12) and (a)(13) (2008) (formerly (a)(10) and (a)(11)).

In summary, the statute makes clear that a "wetland" has three separate, mandatory requirements: "hydric soil," "wetland hydrology," and "hydrophytic vegetation." The statute also make clear that the presence or prevalence of "hydrophytic vegetation" is not sufficient to meet the "wetland hydrology" requirement. Indeed, such a reading of the statutory requirements for a "wetland" is "backwards," in that it is the "wetland

hydrology" that must be sufficient to support a prevalence of hydrophytic vegetation, which is vegetation "typically," but not "exclusively," adapted for life in saturated soil conditions, not the prevalence of hydrophytic vegetation that proves the presence of wetland hydrology.

### b.    The regulatory definition

The regulatory definition of a "wetland" is essentially identical to the statutory definition. *Compare* 7 C.F.R. § 12.2 ("Wetland, except when such term is a part of the term 'converted wetland', means land that—(1) Has predominance of hydric soils; (2) Is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions; and (3) Under normal circumstances does support a prevalence of such vegetation, except that this term does not include lands in Alaska identified as having a high potential for agricultural development and a predominance of permafrost soils."), *with* 16 U.S.C. § 3801(a)(27) (quoted above, beginning on page 23).  At all pertinent times, the statute has provided that "[t]he Secretary shall develop . . . criteria for the identification of hydric soils and hydrophytic vegetation; and . . . lists of such soils and such vegetation," that is, for *two* of the *three* statutory requirements for a "wetland."  16 U.S.C. § 3801(b).  The statute does not expressly authorize the Secretary to develop criteria for the identification of the "inundation *or* saturation" requirement, *i.e.*, the "wetland hydrology" requirement, however.  Nevertheless, the Secretary has purported to develop criteria for the identification of all three of the statutory requirements for a "wetland" in the National Food Security Act Manual (NFSAM), Part 527 (3rd ed., amend. 5, Sept. 2000).

Part 527.4 of the NFSAM defines a "wetland" as follows:

Wetland is defined as land that:

1.    Has a predominance of hydric soils and

2.    Is inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and under normal circumstances, does support, a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions.

NFSAM, Pt. 527.4(I) (Introduction), Administrative Record at 694. Thus, the NFSAM paraphrases and combines the separate "wetland hydrology" and "hydrophytic vegetation" requirements found in the statute (and, for that matter, in the pertinent regulation) into its second numbered requirement. *Compare* 16 U.S.C. § 3801(a)(27)(B) and (C) (defining "inundation or saturation," *i.e.*, "wetland hydrology," and "hydrophytic vegetation" as separate requirements of a "wetland"); 7 C.F.R. § 12.2 (same).

The NFSAM appears to confuse the issue of how many criteria are required to define a "wetland" further with the following explanation:

Wetlands are identified through the confirmation of wetland criteria. *All three* wetland criteria, hydric soils, hydrophytic vegetation, and wetland hydrology, *normally* must be met for an area to be identified as wetland. *Each criterion must be independently assessed by collecting, analyzing, and documenting data to support the determination.* NRCS must demonstrate that an area is wetland, and each determination or delineation must be supported by sufficient evidence. Evidence is gained by collective data through mandatory technical procedures that indicate if wetland criteria are met. The criteria, indicators, and procedures for making wetland determinations and delineations are contained in this section.

NFSAM, Pt. 527.4(I) (Introduction), Administrative Record at 694 (emphasis added). Specifically, although the NFSAM identifies three criteria (after numbering only two), and states that all three must be "independently assessed," it also states that "[a]ll three wetland

criteria . . . *normally* must be met for an area to be identified as a wetland," *id.* (emphasis added), suggesting that there are circumstances in which something less than all three criteria will suffice to define a "wetland." As explained above, such an interpretation is contrary to the plain language of the controlling statute, 16 U.S.C. § 3801(a)(27), which unambiguously makes *all three* statutory requirements for a "wetland" *separate and mandatory*. Indeed, the NFSAM does not explain what *abnormal* circumstances would allow an area to be identified as a wetland even though something less than all three statutory requirements were met.

The NFSAM does provide separate explanations for each of the three criteria for a "wetland." NFSAM, Pt. 527.4(II) (Criteria); Administrative Record 696-98. The explanations of the two criteria that are at issue here are as follows:

> (C)   Hydrophytic Vegetation Criteria
>
>> 1.   <u>Hydrophytic vegetation</u>. Hydrophytic vegetation consists of plants growing in water or in a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content.
>>
>>> a.   A plant shall be considered a plant species that occurs in wetland if such plant is listed in the National List of Plant Species that Occur In Wetlands. The publication may be obtained upon request from the U.S. Fish and Wildlife Service at National Wetland Inventory, Monroe Bldg. Suite 101, 9720 Executive Center Drive, St. Petersburg, Florida 33702.
>>>
>>> b.   For the purpose of the definition of "wetland" in Sec. 12.2 of this part, oland [sic] shall be determined to have a prevalence of hydrophytic vegetation if:

(i) NRCS determines through the criteria specified in paragraph (b)(3) of this section that under normal circumstances such land supports a prevalence of hydrophytic vegetation. The term "normal circumstances" refers to the soil and hydrologic conditions that are normally present, without regard to whether the vegetation has been removed; or

(ii) In the event the vegetation on such land has been altered or removed, NRCS will determine if a prevalence of hydrophytic vegetation typically exists in the local area on the same hydric soil map unit under non-altered hydrologic conditions.

c. The determination of prevalence of hydrophytic vegetation will be made in accordance with the current Federal wetland delineation methodology in use by NRCS at the time of the determination. (Currently, the COE REG IV criteria and indicators for on-site methodology.)

(D)  Wetland Hydrology Criteria

The hydrology criteria for wetlands is [sic] as follows:

1. Inundation (flooding or ponding) occurs for 7 consecutive days or longer during the growing season in most years (50% chance or more); or

2. Saturation at or near the surface occurs for 14 consecutive days or longer during the growing

season in most years (50% chance or more). Soils may be considered saturated to the surface when the water table is within:

a.      0.5 ft of the surface for coarse sand, sand or fine sandy soils; or

b.      1.0 ft of the surface for all other soils.

Further refinement of hydrology criteria for determining farmed wetlands (FW) and farmed wetland pasture (FWP) is [sic] as follows. . . .

NFSAM, Pt. 527.4(II) (Criteria)(C) and (D); Administrative Record 697-98.

Thus, the NFSAM defines "hydrophytic vegetation" as "plants growing in water or in a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content." The NFSAM also attempts to define the alternative requirements of "inundation" and "saturation" for the "wetland hydrology" requirement for a "wetland." 16 U.S.C. § 3801(a)(27). There is simply no reference in the "wetland hydrology" criteria in the NFSAM to the presence of hydrophytic vegetation; rather, the "wetland hydrology" criteria consist of only the alternatives of "inundation" and "saturation."

### 3.    *Review of the Hearing Officer's decision*

Upon the narrow *de novo* review of agency action permitted by the Administrative Procedures Act (APA), the court concludes that the Hearing Officer's final determination was, in several respects, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); *Branstad III*, 212 F. Supp. 2d at 988-89. The court will explain the deficiencies in turn.

### a.    *Conflation of statutory requirements*

Even though the statute, the regulation, and the NFSAM treat "hydrophytic vegetation" and "wetland hydrology" as two of the three *separate, mandatory*

requirements for a "wetland," and neither the statute, the regulation, nor the NFSAM identifies the prevalence of "hydrophytic vegetation" as sufficient to prove "wetland hydrology," the Hearing Officer expressly treated the presence of "hydrophytic vegetation," standing alone, as *adequate to prove* the presence of "wetland hydrology." Administrative Record at 457 ("If a drain tile completely removes the wetland hydrology, I find it unlikely the area would exhibit a predominance of hydrophytic vegetation or soil saturation. Appellant's arguments do not explain the existence of these conditions if the wetland hydrology is absent. . . . On site 1, Appellant contends the underlying sand layer acts as a drain tile eliminating water to the adjoining ditch (FOF 28). As is the case for site 3 (1999), site 1 exhibited soil saturation in the upper 12 inches and 100-percent of the dominant plant species were hydrophytes (FOF 2 and 6). As previously stated, Appellant's arguments lack an explanation of the existence of these conditions absent wetland hydrology."). By conflating the separate "hydrophytic vegetation" and "wetland hydrology" requirements for a "wetland," and improperly placing the burden on B & D to demonstrate why criteria not identified in the statute or regulations as determinative of a wetland did not demonstrate the presence of wetlands, the Hearing Officer's decision that "wetlands" were present on the parcels in question was arbitrary and capricious, an abuse of discretion, and otherwise contrary to law, because it failed to consider all three separate and mandatory statutory requirements for a wetland; improperly considered "hydrophytic vegetation" factors as satisfying the "wetland hydrology" requirement; and failed entirely to consider an important aspect of the problem, that is, whether wetland hydrology was present, according to the pertinent statutory and regulatory criteria of "inundation" or "saturation." *See Branstad III*, 212 F. Supp. at 989 (identifying the inquiries to determine whether agency action was arbitrary and capricious, an abuse of discretion, or contrary to law as including whether the agency considered factors that Congress did intend the agency

to consider; whether the agency considered factors that Congress did not intend the agency to consider; and whether the agency failed entirely to consider an important aspect of the problem).

### b.    *Disregard of pertinent "saturation" evidence*

In addition to improperly conflating the "hydrophytic vegetation" and "wetland hydrology" requirements, the Hearing Officer also completely ignored, or ignored the credibility of, Mr. Gertsma's evidence of the lack of "inundation" and "saturation" within the NFSAM definition based on his nine soil probes in 2005, which showed soil saturation only below 35 inches, as compared to Mr. Moore's single soil probe in 1998, showing saturation in the upper 12 inches.   According to the NFSAM criteria, soil samples revealing saturation only well below one foot of the surface of the soil, in the case of any soils, would indicate a lack of the necessary wetland hydrology.  *See* NFSAM, Pt. 527.4(II) (Criteria) (D); Administrative Record 698 ("Saturation at or near the surface occurs for 14 consecutive days or longer during the growing season in most years (50% chance or more).   Soils may be considered saturated to the surface when the water table is within:  a.  0.5 ft of the surface for coarse sand, sand or fine sandy soils; or b.  1.0 ft of the surface for all other soils.").   Thus, the Hearing Officer's decision runs counter to the evidence before the agency.  *See Branstad III*, 212 F. Supp. at 989 (judicial review asks whether the agency decision runs counter to the evidence before it).   Indeed, even to the extent that the Hearing Officer found some evidence of soil saturation sufficiently close to the surface by Mr. Moore in 1998, there is absolutely no evidence that such saturation obtained for the necessary "14 consecutive days or longer during the growing season in most years (50% chance or more)."  NFSAM, Pt. 527.4(II) (Criteria) (D); Administrative Record 698.   Thus, the agency patently failed to consider an important aspect of the

problem. *See Branstad III*, 212 F. Supp. at 989 (judicial review asks whether the agency failed entirely to consider an important aspect of the problem).

### c. *Disregard of evidence that wetland hydrology had been removed*

The Hearing Officer also completely ignored, or disregarded the credibility of, Mr. Etler's opinion that the tile drainage system and the adjacent county road and ditch removed wetland hydrology, as compared to Mr. Moore's unsupported speculation that the tile drainage system was plugged and Mr. Moore's bald assertions that the county road and ditch were irrelevant to the wetland hydrology of the adjacent site. Thus, contrary to the USDA's present contentions, the Hearing Officer's decision is also flawed because it runs counter to evidence that wetland hydrology was removed on one parcel by a tile drainage system and on another parcel by underlying sand deposits and disturbance of the wetland hydrology by an adjacent county road and ditch. *Branstad III*, 212 F. Supp. 2d at 989 (judicial review asks whether the agency decision runs counter to the evidence presented). The court will examine the pertinent evidence and conclusions more closely.

### i. *The drainage tile issue*. First, as to Site 3, the USDA's argument that the presence of a drainage tile is not a statutory criterion is a red herring. As explained above, "wetland hydrology" is a statutory requirement, and evidence that the drainage tile affected the "wetland hydrology" was plainly relevant. More specifically, the presence of the drainage tile provided a reason that, notwithstanding the presence of hydric soils and hydrophytic vegetation, Mr. Gertsma found that there was no "saturation" within the top foot of the soil in nine soil samples, where "saturation" is a proper criterion for determining whether the "wetland hydrology" requirement was met. *See* 16 U.S.C. § 3801(a)(27) (defining what is elsewhere described as the "wetland hydrology" requirement in terms of "inundation or saturation"); 7 C.F.R. § 12.2 (same); NFSAM, Pt. 527.4(II) (Criteria) (D); Administrative Record 698 (identifying criteria for the necessary

"wetland hydrology" as including "[s]aturation at or near the surface occurs for 14 consecutive days or longer during the growing season in most years (50% chance or more). Soils may be considered saturated to the surface when the water table is within: a. 0.5 ft of the surface for coarse sand, sand or fine sandy soils; or b. 1.0 ft of the surface for all other soils."). The USDA now repeats the Hearing Officer's error by arguing that the drainage tile had little effect on the hydrology of the area, because hydric soils and a prevalence of hydrophytic vegetation were present, but, as explained above, this argument improperly conflates the *separate, mandatory* "wetland hydrology," "hydric soils," and "hydrophytic vegetation" requirements for a "wetland." In short, the Hearing Officer ignored consistent evidence, from the presence of drainage tile and soil samples demonstrating a lack of the necessary "saturation," that "wetland hydrology," a statutory requirement for a "wetland," was missing. Consequently, the Hearing Officer's decision runs counter to overwhelming evidence relating to the proper criteria that "wetland hydrology" was missing. *Branstad III*, 212 F. Supp. 2d at 989 (judicial review asks whether the agency decision runs counter to the evidence presented).

The Hearing Officer's conclusion that the drainage tile did not remove wetland hydrology and the USDA's present argument that the drainage tile was not functional, because water bubbled out of it when it was broken, also run counter to the evidence. *Id.* Indeed, these positions rely entirely upon Tony Moore's unsupported opinion. Mr. Etler provided contrary, expert evidence that the water bubbling into the hole when the tile was broken *did not* demonstrate that the tile was pugged or not functioning, because if the tile was plugged, then the hole would have filled full of water and saturated the ground, and would have continued to be fed by water from further up the line, but the ground was not saturated, and the hole did not overflow. Administrative Record at 375-79. Mr. Etler's opinion was further reinforced by evidence from Mr. Gertsma's soil samples that the soil

was *not* saturated to the degree required by the NFSAM for "wetland hydrology," which plainly suggests that the tile drainage system was working.

The USDA's present argument that the presence of the drainage tile is irrelevant, because there is no evidence that Doane performed any maintenance on the tile when he removed trees on the parcel, injects another red herring into the analysis. The USDA concedes that the tile drainage system had been in place since before 1985. The overwhelming evidence is that the tile drainage system was functional, because the soil was *not* saturated to the degree required by the NFSAM for "wetland hydrology." Thus, whether or not Doane had performed any maintenance on the tile is simply irrelevant.

*ii.*      ***The adjacent disturbance issue***. As to Site 1, where only a "wetland" determination, but no "conversion" determination, had been made, the Hearing Officer's decision is equally unsupportable. B & D argued that the "wetland hydrology" of this site had been removed by an underlying sand deposit and "disturbed" by an adjacent county road and ditch. The Hearing Officer concluded that the presence of underlying sand deposits and the adjacent county road and ditch did not have sufficient effect on the wetland hydrology of Site 1, again, because of the presence of hydric soils and hydrophytic vegetation. For the reasons stated above, the Hearing Officer's conflation of the separate statutory requirements made this portion of his decision arbitrary and capricious. The correct question, which the Hearing Officer did not ask, was whether the underlying sand deposit and the adjacent county road and ditch had removed or disturbed the "inundation" or "saturation" characteristics of the site, so that it was no longer a "wetland." Thus, the Hearing Officer also patently failed to consider an important aspect of the problem. *See Branstad III*, 212 F. Supp. at 989 (judicial review asks whether the agency failed entirely to consider an important aspect of the problem). Again, there is no evidence that this site was subjected to sufficient "saturation" or "inundation" to give it the necessary "wetland

hydrology." Rather, the evidence, including Mr. Etler's testimony concerning the elevations and drainage characteristics of the site, and even Mr. Moore's observations of water and cattails in the ditch, show that the site drained into the adjacent ditch. Thus, the Hearing Officer's decision as to Site 1 also runs so counter to the evidence as to be arbitrary and capricious. *Id.* (judicial review asks whether the agency decision runs counter to the evidence presented).

The USDA now argues that B & D's argument that the site had been "disturbed" is irrelevant, because there is no evidence that B & D "disturbed" the site, the "disturbance" was on adjacent land, and the "disturbance" was the result of action of a third party, the county. This argument is also a red herring. First, the NFSAM states that "[d]isturbances may be on-site (e.g., draining, dredging, filling) or off-site (e.g., terraces, diversions, dams, head-cuts)." NFSAM, pt. 527.4(III) (Indicators for Wetlands on Agricultural Lands) (C) (Disturbed Areas); Administrative Record at 704. Thus, nothing in the pertinent regulations limits relevant "disturbances" to actions on the parcel in question, quite the contrary. Moreover, the court has found nothing in the NFSAM limiting the relevant "disturbances" to actions of the farmer of the purported "wetland." The NFSAM explains, further, that "disturbance includes any activity that affects the flow of water into or out of the wetland." *Id.*[3] Plainly, an adjacent ditch, which Mr. Etler explained in his report was excavated below a level to cause drainage from the adjacent parcel, *see* Administrative Record at 1356-59, would "affect[] the flow of water . . . out of the wetland." NFSAM, pt. 527.4(III) (Indicators for Wetlands on Agricultural Lands)

---

[3]Interestingly, while NFSAM pt. 527.4(III)(C) states "procedures for evaluating the soils, vegetation and hydrology on disturbed areas," the present record includes only the parts identifying the procedures for evaluating soils and vegetation, but not the expected part identifying procedures for evaluating hydrology. *See* Administrative Record at 704.

(C) (Disturbed Areas); Administrative Record at 704. In short, to the extent that the Hearing Officer ignored the presence of the adjacent ditch, he failed to consider an important aspect of the problem and his decision, thus, was arbitrary and capricious. *Branstad III*, 212 F. Supp. at 989 (judicial review asks whether the agency failed entirely to consider an important aspect of the problem). To the extent that the Hearing Officer considered the presence of the adjacent ditch, but concluded that it had no effect on the wetland hydrology of Site 1, that conclusion runs so counter to the evidence presented as to be arbitrary and capricious. *Id.* (judicial review asks whether the agency decision runs counter to the evidence presented).

### d.    Summary

Based upon these errors individually and their accumulation in this case, the court finds that the Hearing Officer's decision is so flawed that it cannot be ascribed to a difference in view or the product of agency expertise. *Id.* The Hearing Officer's decision that "wetlands" existed on Site 3 and Site 1 is, thus, arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); *Branstad III*, 212 F. Supp. 2d at 988-89.

## D.  The Appropriate Relief

If the court finds that the Hearing Officer's "final" determination must be overturned as arbitrary and capricious, an abuse of discretion, or contrary to law, B & D asks the court, *inter alia*, to remand the matter to the agency with specific instructions that the agency determine the following: (1) that B & D's removal of woody vegetation from t1653 does not make it ineligible for farm program benefits and, (2) that any wetlands on t1653 are converted wetlands converted prior to December 23, 1985. *See* Complaint, Demand for Judgment. However, as this court observed in a prior incarnation of this case,

such further instructions are beyond the court's authority, because the APA permits the court only to "hold unlawful and set aside agency action, findings, and conclusions found to" fail the standard of review. *See B & D II*, 332 F. Supp. 2d at 1216 (citing 5 U.S.C. § 706(2)). Thus, the Hearing Officer's "final" determination as to t1653 will be vacated in its entirety and the case will be remanded for agency action in conformity with the court's judgment that the record does not support determinations that "wetlands" exist on Site 1 and Site 3 of t1653.

B & D also prays that the court will find that the position of the USDA was not substantially justified and grant B & D reasonable attorney fees pursuant to the provisions of 28 U.S.C. § 2412; that the court will grant B & D the costs of suit herein; and that the court will grant such further and other relief as the court deems appropriate. Complaint, Demand for Judgment. It is true that the Equal Access to Justice Act (EAJA) allows most parties who prevail against the United States in civil litigation to recover costs, *see* 28 U.S.C. § 2412(a), and to recover attorney fees and some litigation expenses if the United States fails to prove that its position in the litigation "was substantially justified or that special circumstances make an award unjust," *see* 28 U.S.C. § 2412(d)(1)(A). *See generally Branstad v. Veneman*, 232 F. Supp. 2d 945, 951 (N.D. Iowa 2002) (*Branstad IV*) (quoting *Herman v. Schwent*, 177 F.3d 1063, 1065 (8th Cir. 1999)). Nevertheless, the court finds that a determination of whether fees and costs should be awarded, and the amount of such fees and costs, should be reserved for consideration upon an application for attorney fees pursuant to N.D. IA. L.R. 54.1 (formerly 54.2) and costs pursuant to N.D. IA. L.R. 54 (formerly 54.1). *See, e.g., Branstad III*, 212 F. Supp. 2d at 1007 n.8.

### III. CONCLUSION

Upon the foregoing, the court finds and declares that the Hearing Officer's August 30, 2007, decision, which constitutes the "final determination" of the USDA, finding "wetlands" on Site 1 and Site 3 of t1653, is arbitrary and capricious, an abuse of discretion, and contrary to law.

THEREFORE, the Hearing Officer's "final" determination as to t1653 is **vacated in its entirety** and the case is **remanded** for agency action in conformity with the court's judgment that the record does not support determinations that "wetlands" exist on Site 1 and Site 3 of t1653.

**IT IS SO ORDERED.**

**DATED** this 5th day of November, 2008.

_Mark W. Bennett_
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA